

FILED
IN OPEN COURT

OCT 2 2 2015

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

## Lacey Act Compliance Framework[1]

### 1. Compliance Objectives

As a company, Lumber Liquidators Inc., including all current and subsequent direct and indirect subsidiaries[2] ("Lumber Liquidators" or the "Company") is committed to being a good "corporate citizen" and abiding by the applicable laws, rules and regulations wherever we do business. As part of its efforts to continuously improve its processes and procedures, the Company, in consultation with third-party subject matter experts, updates and revises relevant Company policies in an effort to meet this commitment.

As an industry leader, the Company seeks to conserve and protect threatened forest habitats and safeguard the future of natural resources critical to the timber industry. A large part of this effort is the support and use of legally harvested and exported sustainable wood sources. Compliance with relevant laws, including the Lacey Act (16 U.S.C. §§ 3371 *et seq.*) is a critical component of a transparent, legal, and sustainable supply chain.

The objective of this document is to set forth a framework that will help ensure legal wood sourcing, accurate reporting, and accurate labeling. As part of a comprehensive Lacey Act compliance program, the Company will develop specific procedures and documents that implement the rules set forth below. This document, therefore, represents only the minimum standards that will be met by the Company, as opposed to the specific procedures that the Company will utilize to meet the standards herein.

### 2. Legal Background

The Lacey Act is the oldest wildlife protection statute in the United States. Initially enacted to protect animal species, the Lacey Act was amended, effective May 22, 2008, to more broadly include plant species. The goals of the amendment were, amongst others, to prevent trade in illegally-harvested lumber and products made thereof, to ensure that U.S. companies were operating on a level playing field, and to provide better transparency into the source and species of products being imported into the U.S.

### 2.1. General Prohibitions Under the Lacey Act

The Lacey Act makes it unlawful to:

Trade in any plant that is taken, possessed, transported, or sold in violation of the laws of the United States, a State, Indian Tribe, or any foreign law that protects plants; Falsify or submit falsified documents, accounts or records of any plant covered by the Lacey Act; and/or Import plants and plant products (with some exemptions) without an import declaration.

---

[1] Pursuant to Special Condition No. 1 of the Plea Agreement in *U.S. v. Lumber Liquidators, Inc.* (Case No. 2:15-cr-126), this Framework is synonymous with the court-mandated Environmental Compliance Plan.

[2] Pursuant to the footnote one of the Plea Agreement and the Guaranty Agreement with Lumber Liquidators Holdings, Inc., this framework is binding upon Lumber Liquidators Holdings, Inc. and all direct and indirect subsidiaries and business units.

The full text of the Lacey Act can be found at Attachment A. In addition, a useful reference guide can be found at http://www.aphis.usda.gov/plant_health/lacey_act/-index.shtml.

### 2.2. Lacey Act Penalties

Violations of the Lacey Act carry serious penalties for companies and individuals. In addition to civil fines and forfeiture of goods, criminal penalties may also attach to individuals or companies found to have knowingly, and in some cases with lack of due care, violated the Lacey Act.

A misdemeanor violation of the Lacey Act, punishable by up to one (1) year in prison and a fine of $100,000 ($200,000 for companies), may be found if, in the exercise of due care, the individual or the company should have known the wood it purchased was illegally taken, possessed, transported or sold. Felony culpability, punishable by up to five (5) years in prison and a $250,000 ($500,000 for companies), may lie for knowing violations of the Lacey Act.

### 3. Program Authority and Governance

Lumber Liquidators shall implement and maintain a code of business conduct and ethics that affirms that every employee at Lumber Liquidators shall be responsible for compliance with the Lacey Act's requirements, as with every other regulation to which the Company is subject. Employees in the various business units shall have the primary responsibility to ensure that the Company adheres to laws like the Lacey Act and when there is a question as to whether an action is or is not permitted, it is their duty to consult their counterparts in Legal and Compliance before proceeding.

In turn, the leaders of these business units shall be responsible for ensuring that their teams and the third parties they engage follow all necessary compliance procedures.

Lumber Liquidators' Chief Compliance Officer (CCO) shall be responsible for the oversight of the Company's program to address the requirements of the Lacey Act and related regulations. The CCO shall report directly to the Chief Executive Officer (CEO) of the Company, shall make periodic (at least semi-annual) reports regarding compliance matters directly to the Board of Directors of the Company or a Committee of the Board of Directors of the Company (the term "Board" shall mean such Board of Directors or Committee thereof), and shall be authorized to report on such matters to the CEO of the Company and the Board at any time. A team of individuals that focuses on the requirements of the Lacey Act ("Lacey team") shall report directly to the CCO. At least one member of the Lacey team, which may include the CCO, shall be a U.S.-based employee with at least approximately five years of experience in the timber-product or forestry industry. The Lacey team shall coordinate with other business functions, as appropriate, to meet the requirements of the Lacey Act Compliance Program and its associated processes. Each business function shall have a designated member of the Lacey team that is responsible for liaising with that business function.

4. Due Care and Diligence

Lumber Liquidators will exercise due care and diligence through the research, review and validation of relevant information regarding merchandise sold in its stores and the individuals and organizations with which the Company conducts business.

There will be four general steps in the Company's due care activities: risk assessment, vendor validation/evaluation, purchase order (PO) review, and auditing/monitoring. In addition to those four steps the Company will exercise due care by providing its employees with training and tools to report any potential Lacey Act concerns via secure and anonymous means. The Company's procedures to ensure the exercise of due care shall all be memorialized.

5. Risk Assessment

Lumber Liquidators will use a risk-based approach to the implementation of the various elements of its compliance program including the Lacey Act Compliance Program.

a) The Risk Assessment described in this numbered paragraph shall be implemented according to the following schedule:
   (i) For a new supplier that deals in wood product sourced from outside the United States, prior to the import or shipment of wood product to the United States;
   (ii) For an existing supplier of wood product, and if that supplier is located in Asia or South America, by no later than March 1, 2016;
   (iii) For an existing supplier of wood product, and if that supplier is located in Africa, Central America, or Mexico, by no later than June 1, 2016;
   (iv) For an existing supplier of wood product, and if that supplier is otherwise located outside the United States, by no later than December 31, 2016;
   (v) For all other new or existing suppliers of wood product, by no later than March 1, 2017; and
   (vi) For an existing supplier of wood product, prior to onboarding or shipping to the United States any product line or SKU that includes a high-risk product or plants that are listed on any Appendix of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (without regard to purported country of origin for Appendix III species); although if such a supplier has already undergone a full risk assessment within the previous twelve months, a targeted risk assessment, which must include an in-person site visit, may be conducted with regard to the new product line/SKU.
b) In evaluating risk of a supplier, a U.S.-based member of the Lacey team will consider, in addition to other factors:
   (i) Product risk:
      (1) Any legal/regulatory requirements related to the raw materials for a specific product (such as logging bans or export quotas);
      (2) Reported instances of illegal or unethical logging in the relevant geographical region or related to the relevant product or species;
      (3) The potential for species substitution;

3

        (4) The protected status of the species used in the product;

    (ii)  The level of vertical integration between forest and supplier;

    (iii) Country-level corruption ratings from third party sources;

    (iv) Legality concerns noted by private sector or government third parties;

    (v)  Unusual "deals" or sales methods;

    (vi) Relative market and offer prices;

    (vii)  Results of an in-person audit at the supplier's place of business, completed by a member of the Lacey team, third-party certification body, or third-party auditor with specialized industry expertise; and

    (viii) In light of the above factors, the supplier's past and present ability to provide documentation that appears to be legitimate and consistent with legal harvest and sufficient to demonstrate chain of custody.[3]

  c) Lumber Liquidators, may also consider the following factors,

    (i)  The length of the relationship between Lumber Liquidators and the supplier;

    (ii) The importance of the product to Lumber Liquidators; and

    (iii)The amount of a product purchased per year or the amount of product purchased from a supplier per year;

Once all of these factors, and any others found to be appropriate, are considered as part of an objective matrix and are given a risk level, the Company will designate each supplier and product (SKU) as low risk, medium risk, or high risk, and set out specific restrictions regarding doing business with each supplier, such as additional approval or other monitoring requirements (if any) beyond what is set forth herein that are deemed appropriate. If the supplier is providing a product that is considered high risk per the above factors, then that supplier will automatically be considered high risk.  Further, the factors enumerated in subparagraph c) above may not constitute more than 10% of any objective risk matrix.

If a supplier is considered medium or high risk, then the Chief Compliance Officer must give initial approval before any product is purchased or any transactions are completed that would result in a shipment to United States of product from such a supplier. The CCO must make a written record of the decision-making process.

A supplier shall be evaluated every three years if low risk, every two years if medium risk, and every year if high risk. If the Company has never purchased product from the supplier, then the evaluation must take place before the Company begins to import product from that supplier is into the U.S.

---

[3] Each time that a supplier or product undergoes a risk evaluation or revaluation, a member of the Lacey team (or a third party engaged by the Company to provide this service) shall conduct an internet search in order to determine what the most recent legality concerns are for that product or supplier.  The search should include regional legality concerns, the history of the supplier, and legality concerns related to the specific specie(s) being evaluated.  The efforts to determine current legality concerns must include information from a minimum of four sources and must be documented and retained.  Though internet-based resources are subject to change, current sources of information on timber legality issues include: Global Forest Registry (www.globalforestregistry.org), the Global Forest Trade Network Guide to Legal and Responsible Sourcing (http://sourcing.gftn.panda.org/), Keep it Legal Country Guides, and the Forest Legality Alliance (http://www.forestlegality.org/)

A member of the Lacey team (or an internal employee trained in Lacey inspection protocols and reporting up to CCO, either on a full-time or project basis), third-party auditor with specialized industry expertise, or appropriate certification body, shall conduct onsite inspection visits no less than quarterly for medium and high risk suppliers, as well as low risk suppliers who are providing medium risk products. A record of the onsite visit will be maintained by a U.S.-based member of the Lacey team.

Lumber Liquidators will continuously evaluate its risk assessment methodology to stay current with legislative/regulatory updates and external trends. The CCO shall be responsible for the development and implementation of risk assessment procedures designed to address all components of the Lacey Act Compliance Program, but any modifications to the Program shall not be less stringent that what is set forth in this Framework.

6. Vendor Validation and Evaluation

The CCO shall be responsible for implementing procedures designed to ensure that Lumber Liquidators does not conduct business with suppliers and other vendors whose products or activities may be in violation of Lacey Act requirements. A critical element for avoiding business activities with non-compliant third parties is to establish a third party due diligence process aimed at not engaging such vendors in the first place.

When onboarding a new supplier or vendor whose activities implicate Lacey Act requirements, the Lacey team will work with the relevant business functions to complete a series of procedures to ensure the vendor is capable of meeting the Company's standards. These procedures will include, but are not limited to:

a) A risk assessment as described in section 5 of this document;
b) A sample purchase order-level evaluation as described in section 7 of this document;
c) An in-person audit by a member of the Lacey team, appropriate third-party certification body, or third-party auditor with specialized industry experience; and
d) The procurement of language skills and the use of those skills to assess submitted documentation of sourcing and legality.

The Lacey team will be responsible for memorializing the above steps. The CCO must provide written authorization to conduct business with a new supplier before the Company may engage in any transactions with that new supplier. The authorization must include consideration of the factors listed above.

To the extent that the Lacey Act-specific onboarding requirements overlap with the procedures of the Company's supplier audits, those procedures can be used to fulfill the requirements of this program. However, to the extent that those procedures rely on self-reported information provided by potential vendors, those supplier audit procedures should be supplemented by the above items where appropriate in order to independently verify and augment the data supplied by the third parties under review.

5

7. Purchase Order Review

The Lacey team shall be responsible for creating and implementing a risk-based approach to ensure that Purchase Orders ("POs") comply with the Lacey Act. The purpose of the PO review is not just to audit the PO documents, but to ensure that by June 1, 2016, Lumber Liquidators can establish an unbroken and verified chain of custody from itself back to the product's source using documentation down to the forest level.

At a minimum, prior to the importation of any wood product, a U.S.-based member of the Lacey team shall:

a) Review and catalog all supplemental documentation showing the harvest location, harvest legality, and chain of custody for timber used to fulfill each purchase order.
    i) If the documentation is not written in a language known to the Lacey team member, the company shall procure a translation;
b) Review relative market and offer prices;
c) Determine whether the supplemental documentation has been previously used;
d) Determine whether all supplemental documentation is capable of supporting the quantity of timber included in the PO;
e) Determine whether all supplemental documentation is internally consistent and rational (e.g., the timber species is the same across all documents, there are no extensive temporal gaps, the timing is rational, the species actually grows in that area, etc.);
f) Review the PPQ-505 declaration to determine if all information is consistent with and supported by supplemental documentation;
g) Submit the PPQ-505 declaration at the time of import, prior to submission to USDA-APHIS; and
h) Document the decision as to whether the purchase order, in consideration of above factors and the product and supplier risk, reasonably appears to be legally sourced, including the basis for that decision.

Required documentation may be compiled by a non-U.S. based employee trained in Lacey compliance that reports up to CCO. Additional monitoring and auditing processes (if deemed appropriate) conducted by U.S. based employees reporting up to the CCO (either on a full time or project basis) shall be implemented, based on risk level of product and supplier. To be clear, each PO for a medium or high risk product or from a medium or high risk supplier shall be reviewed and analyzed as above and requires clearance before importation into the U.S., and if cleared, such clearance must be signed off by the CCO, or the CCO's designee. A record shall be kept indicating which member of the Lacey team performed each of the above tasks for each purchase order.

If any purchase order is not accompanied by sufficient supplemental documentation to support legality, or the PPQ-505 declaration cannot be supported by the supplemental documentation, then the product will not be accepted until such documentation is provided. If the documentation is not provided within a reasonable time, then the product will not be imported. If a product has

6

already been shipped at the time that a deficiency is identified, then the Company shall reject the product and ship it back to the supplier.

### 8. Auditing and Monitoring

The Chief Compliance Officer, using either internal or third-party resources[4], shall ensure that appropriate auditing and monitoring activities are conducted for Lacey Act compliance. These activities shall include field and desk audits to verify that Company requirements are being met, identification of necessary corrective action, and ensuring that ongoing monitoring is incorporated into the Company's activities.

### 9. Remediation and Mitigation

The Chief Compliance Officer shall be responsible for remediation and mitigation relating to the Lacey Act Compliance Program. Corrective action plans and verification procedure(s) shall be used when missteps are detected during audit monitoring and/or review processes, or otherwise. If, at any point in the purchase or order cycle, the Company becomes aware that a product does not adhere to Lumber Liquidators' requirements, the Company will reject the PO and refuse to import, return, and/or refuse receipt of the product as appropriate at that point in the cycle. Further, Lumber Liquidators may require the DNA and/or isotope testing of products as needed to verify that the genus, species, and/or growing region of a raw material used to produce a product is consistent with the information provided by the supplier. For any medium or high risk products, a program of random species identification of products will be developed and implemented on an ongoing basis beginning no later than January 1, 2016.

Business units (such as Merchandising) engage in the primary activities that implicate the Lacey Act Compliance Program. Therefore, while the Chief Compliance Officer shall be the approver of the Lacey Act Compliance Program, each business unit leader shall be responsible for ensuring that employee and third-parties working in his or her business unit adhere to the established protocols to address compliance with the Lacey Act, including but not limited to, the tracking and enforcement of identified, required corrective action(s), including those issued to product suppliers.

If, at any point, a member of the Lacey team or any other employee determines that the Company is not internally capable of sufficiently auditing or evaluating a supplier or a product, then that concern should be reported through appropriate channels to the CCO. The CCO shall make a record of the concern, should consider the concern, and where appropriate, either increase internal capabilities as needed, or engage a third-party to conduct the activities that the Company cannot sufficiently complete internally. If the decision is made that the reported concern was unfounded, the CCO shall make a record of that decision and the basis therefore.

---

[4] Pursuant to the Plea Agreement in this case, the Lacey Act compliance procedures will be audited by a third-party for at least three of the first four years of probation.

7

### 10. Training and Communication

The leaders of the business units implicated by the Lacey Act shall bear the primary responsibility for ensuring that all necessary employees receive the proper training. The Chief Compliance Officer shall be responsible for providing training and updates related to the requirements of the Lacey Act and applicable regulations as well as the Company's policies and procedures.

Annual training regarding the Lacey Act and the Company's Lacey Act compliance program will be required for employees and third parties whose responsibilities are affected by the Lacey Act. The CCO will identify employees and third parties who must receive the Lacey Act training and such training will be tailored based upon the degree to which an employee's or third party's duties relate to the Lacey Act. The Lacey team will develop these training programs, coordinating with other business functions as appropriate. A record will be maintained of the identity and position of each employee trained each year, and the date(s) of training.

### 11. Disciplinary Action for Non-Compliance

Any Company employee who is found to have violated any of the procedures contained in the Company's Lacey Act Compliance Program will be subject to disciplinary action including possible termination. The Company will maintain records related to any such disciplinary action in the personnel files of any affected employee.

### 12. Records Retention

Lumber Liquidators will retain all records related to Lacey Act compliance for a minimum of 5 years.

### 13. Reporting Violation and Non-Retaliation

Directors, officers, employees, and agents will be directed to report any potential misconduct if they have a good faith belief that there may be a violation of law or the Lacey Act Compliance Program and accompanying procedures. Reports may be made anonymously through the telephone hotline or email hotline, or to supervisors, management, Legal, or Compliance.

8